# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CEDAR PARK ASSEMBLY OF GOD OF KIRKLAND, WASHINGTON,

*Plaintiff-Appellant*,

v.

MYRON KREIDLER, in his official capacity as Insurance Commissioner for the State of Washington, AKA Mike Kreidler; JAY ROBERT INSLEE, in his official capacity as Governor of the State of Washington,

*Defendants-Appellees.*

On Appeal from the
United States District Court for the Western District of
Washington at Tacoma
Case No. 3:19-cv-05181, Hon. Benjamin H. Settle

## BRIEF OF AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE, INTERFAITH ALLIANCE, THE RECONSTRUCTIONIST RABBINICAL ASSOCIATION, AND THE SIKH COALITION AS *AMICI CURIAE* SUPPORTING APPELLEES AND AFFIRMANCE

BRADLEY GIRARD
JENNY SAMUELS
Americans United for Separation
  of Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
(202) 466-3234

*Counsel for* Amici Curiae

**CORPORATE DISCLOSURE STATEMENT**

*Amici* are nonprofit corporations. They have no parent corporations, and no publicly held corporation owns any portion of any of them.

# TABLE OF CONTENTS

Corporate Disclosure Statement ....................................................... i

Table of Authorities .......................................................................... iii

Interest of *Amici Curiae* .................................................................... 1

Introduction ........................................................................................ 3

Argument ............................................................................................ 4

I.   SB 6219 does not implicate, much less violate, the ecclesiastical-abstention doctrine ................................................................ 4

II.  Granting Cedar Park's request would render Free Exercise jurisprudence and the ministerial exception superfluous. ..................... 13

Conclusion ....................................................................................... 17

# TABLE OF AUTHORITIES

| Cases | Page(s) |
|---|---|

*Askew v. Trs. of Gen. Assembly of Church of the Lord Jesus
Christ of the Apostolic Faith Inc.*,
684 F.3d 413 (3d Cir. 2012)........................................................5

*Belya v. Kapral*,
45 F.4th 621 (2d Cir. 2022),
*cert. denied*, 143 S.Ct. 2609 (2023) ............................................1

*Billard v. Charlotte Cath. High Sch.*,
No. 17-cv-11, 2021 WL 4037431 (W.D.N.C. Sept. 3, 2021),
*appeal argued*, No. 22-1440 (4th Cir. Sept. 20, 2023) .............16

*Bob Jones Univ. v. United States*,
461 U.S. 574 (1983). ..................................................................14

*Bryce v. Episcopal Church in the Diocese of Colo.*,
289 F.3d 648 (10th Cir. 2002). ....................................................5

*Burri Law PA v. Skurla*,
35 F.4th 1207 (9th Cir. 2022)...................................................5, 8

*City of Boerne v. Flores*,
521 U.S. 507 (1997) .....................................................................9

*Communist Party of U.S. v. Subversive Activities Control Bd.*,
367 U.S. 1 (1961) .........................................................................9

*Donahoe v. Richards*,
38 Me. 379 (Me. 1854). ..............................................................12

*Emp. Div. v. Smith*,
494 U.S. 872 (1990) ...............................................................3, 13

*Engel v. Vitale*,
370 U.S. 421 (1962) .....................................................................9

*Everson v. Bd. of Educ.*,
330 U.S. 1 (1947) .........................................................................9

*Fulton v. City of Phila.*,
141 S.Ct. 1868 (2021) ................................................................13

*Garrick v. Moody Bible Inst.*,
 No. 21-2683 (7th Cir. argued Dec. 5, 2023)................................1

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
 565 U.S. 171 (2012) .....................................................7, 15, 16

*Huntsman v. Corp. of the President of the Church of Jesus
 Christ of Latter-Day Saints*,
 76 F.4th 962 (9th Cir. 2023),
 *petition for reh'g or reh'g en banc filed* ..............................1, 5, 7

*Jones v. Wolf*,
 443 U.S. 595 (1979) ..........................................................7

*Kedroff v. St. Nicholas Cathedral of Russian
 Orthodox Church in N. Am.*,
 344 U.S. 94 (1952) .....................................................4, 6, 7, 8

*Kennedy v. Bremerton Sch. Dist.*,
 142 S.Ct. 2407 (2022) ........................................................8

*Larkin v. Grendel's Den, Inc.*,
 459 U.S. 116 (1982). .........................................................9

*McCarthy v. Fuller*,
 714 F.3d 971 (7th Cir. 2013) .................................................5

*Newman v. Piggie Park Enters., Inc.*,
 390 U.S. 400 (1968) ........................................................14

*Our Lady of Guadalupe v. Morrissey-Berru*,
 140 S.Ct. 2049 (2020) ................................................3, 13, 15

*Paul v. Watchtower Bible and Tract Soc'y of N.Y., Inc.*,
 819 F.2d 875 (9th Cir. 1987) .................................................5

*Phillips v. Gratz*,
 2 Pen. & W. 412 (Pa. 1831) .................................................12

*Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l
 Presbyterian Church*,
 393 U.S. 440 (1968) ..........................................................7

*Puri v. Khalsa,*
844 F.3d 1152 (9th Cir. 2017) ...................................7

*Reynolds v. United States,*
98 U.S. 145 (1878) ...................................14

*Serbian Eastern Orthodox Diocese v. Milivojevich,*
426 U.S. 696 (1976) ...................................6, 7

*Stormans, Inc. v. Wiesman,*
794 F.3d 1064 (9th Cir. 2015) ...................................13

*Tony & Susan Alamo Found. v. Sec'y of Lab.,*
471 U.S. 290 (1985) ...................................14

*United States v. Lee,*
455 U.S. 252 (1982) ...................................14

*Watson v. Jones,*
80 U.S. (13 Wall.) 679 (1871) ...................................5, 6, 14

**Statutes**

Wash. Rev. Code § 48.43.072 ...................................3

Wash. Rev. Code § 48.43.073 ...................................3

**Constitutions and Charters**

Del. Decl. of Rights of 1776, § 3 ...................................10

Ga. Const., art. LVI (1777) ...................................11

Mass. Const., art. II (1780) ...................................11

Md. Const., art. XXXIII (1776) ...................................11

N.H. Const., part I, art. 5 (1784) ...................................11

N.Y. Const., art. XXXVIII (1777) ...................................11

R.I. Charter (1663) ...................................11

S.C. Const., art. VIII, § 1 (1790) ...................................11

## Other Authorities

Gerard V. Bradley, *Beguiled: Free Exercise Exemptions and the Siren Song of Liberalism*, 20 Hofstra L. Rev. 245 (1991) ....................................................12

Carl H. Esbeck, *Protestant Dissent and the Virginia Disestablishment, 1776-1786*, 7 Geo. J.L. & Pub. Pol'y 51 (2009) ............................................9

Philip A. Hamburger, *A Constitutional Right of Religious Exemption: An Historical Perspective*, 60 Geo. Wash. L. Rev. 915 (1992) ............................................11

Marci A. Hamilton, *Religious Institutions, the No-Harm Doctrine, and the Public Good*, 2004 BYU L. Rev. 1099 ............................................12

Thomas Jefferson, An Act for Establishing Religious Freedom (Oct. 31, 1785), *in* The Founders' Constitution (Philip B. Kurland & Ralph Lerner, eds.), http://tinyurl.com/27r6htw5 ...............10

Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409 (1990) ............................................10

Vincent Phillip Muñoz, *The Original Meaning of the Free Exercise Clause: The Evidence from the First Congress*, 31 Harv. J.L. & Pub. Pol'y 1083 (2008) ....................................12

Ellis West, *The Case Against a Right to Religion-Based Exemptions*, 4 Notre Dame J.L. Ethics & Pub. Pol'y 591 (1990) .................................10

## INTEREST OF *AMICI CURIAE*[1]

Americans United for Separation of Church and State is a national, nonpartisan organization that for over seventy-five years has brought together people of all faiths and the nonreligious who share a deep commitment to religious freedom as a shield to protect but never a sword to harm others. Americans United has expertise in this case because it is frequently counsel in cases that present questions of the scope of the ecclesiastical-abstention doctrine. *See, e.g.*, *Garrick v. Moody Bible Inst.*, No. 21-2683 (7th Cir. argued Dec. 5, 2023); *Huntsman v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, 76 F.4th 962 (9th Cir. 2023), *petition for reh'g or reh'g en banc filed*; *Belya v. Kapral*, 45 F.4th 621 (2d Cir. 2022), *cert. denied*, 143 S.Ct. 2609 (2023). Americans United thus has an interest in ensuring that applications of the ecclesiastical-abstention doctrine serve—and do not distort—its important purpose.

Interfaith Alliance is a network of people of diverse faiths and beliefs from across the country working together to build a resilient democracy and

[1] Counsel for all parties consented to this brief's filing. No party's counsel authored the brief in whole or in part; no party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person contributed money that was intended to fund preparing or submitting the brief.

fulfill America's promise of religious freedom and civil rights not just for some, but for all.

The Reconstructionist Rabbinical Association is a 501(c)(3) organization that serves as the professional association of 380 Reconstructionist rabbis, the rabbinic voice of the Reconstructionist movement, and a Reconstructionist Jewish voice in the public sphere. Based on the understanding of Jewish teachings that every human being is created in the divine image, the Reconstructionist Rabbinical Association has long advocated for public policies of inclusion, antidiscrimination, and equality.

The Sikh Coalition is the largest community-based organization working to protect Sikh civil rights across the United States. The Sikh Coalition's goal is working towards a world where Sikhs, and other religious minorities in America, may freely practice their faith without bias and discrimination. Since its inception, the Sikh Coalition has worked to defend civil rights and liberties for all people, empower the Sikh community, create an environment where Sikhs can lead a dignified life unhindered by bias or discrimination, and educate the broader community about Sikhism.

## INTRODUCTION

The First Amendment "does not mean that religious institutions enjoy a general immunity from secular laws." *Our Lady of Guadalupe v. Morrissey-Berru*, 140 S.Ct. 2049, 2060 (2020). Although afforded dominion over matters of faith and internal church governance, religious entities are not, and have never been, above the law. Indeed, "[a]ny society adopting such a system would be courting anarchy." *Emp. Div. v. Smith*, 494 U.S. 872, 888 (1990).

Despite these repeated admonitions, Cedar Park Assembly of God now claims the right to opt out of a law simply because it disagrees with it. Worse yet, Cedar Park grounds its unprecedented demand in an inapplicable doctrine—ecclesiastical abstention.

The law in question, SB 6219, requires health plans to provide coverage for vital reproductive healthcare services, including contraception and abortion care. Wash. Rev. Code §§ 48.43.072, 48.43.073. Notwithstanding that SB 6219 does not require Cedar Park to provide or pay for abortion coverage either directly or indirectly, Kreidler Br. 7, 10, Cedar Park objects to SB 6219 because Cedar Park believes and teaches that abortion is a sin. Cedar Park Br. 7.

Cedar Park argues that because it disagrees with SB 6219 on religious grounds, the ecclesiastical-abstention doctrine gives it a right to disregard

the statute. But ecclesiastical abstention is a narrow doctrine that requires the state to defer to religious authorities on religious questions, guaranteeing that religious institutions have the right to shape their own doctrine. And because SB 6219 does not affect Cedar Park's authority to shape its own religious doctrine, the district court correctly held that ecclesiastical abstention is not implicated—much less violated—by SB 6219. 1-ER-27.

Amici agree with Appellees that SB 6219 does not violate any of Cedar Park's First Amendment rights. We write separately to explain why Cedar Park's ecclesiastical-abstention arguments are ahistorical, unworkable, and would effectively abrogate Free Exercise jurisprudence and the ministerial exception. We urge this Court to reject Cedar Park's attempt to turn this narrow doctrine into a free pass to decide what laws to follow.

## ARGUMENT

## I.   SB 6219 does not implicate, much less violate, the ecclesiastical-abstention doctrine.

**A.** The ecclesiastical-abstention doctrine protects religious institutions' "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116

(1952).[2] Thus, for example, a court cannot question an ecclesiastical body's determination about who qualifies as a nun, *McCarthy v. Fuller*, 714 F.3d 971, 978 (7th Cir. 2013), probe the reasonableness of a church-member's excommunication, *Askew v. Trs. of Gen. Assembly of Church of the Lord Jesus Christ of the Apostolic Faith Inc.*, 684 F.3d 413, 419-20 (3d Cir. 2012), or dictate internal church discussions about church doctrine, *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 658 (10th Cir. 2002). Put simply, "a civil court may not adjudicate 'the correctness of an interpretation of canonical text or some decision relating to government of the religious polity.'" *Burri Law PA v. Skurla*, 35 F.4th 1207, 1212 (9th Cir. 2022) (quoting *Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 819 F.2d 875, 878 n.1 (9th Cir. 1987)).

This principle was first articulated by the Supreme Court in *Watson v. Jones*, 80 U.S. (13 Wall.) 679 (1871). *Watson* concerned a dispute between two congregational factions about the correct interpretation of church doctrine. *Id.* at 690-93. The dispute had been resolved by the church's General Assembly—the highest ecclesiastical authority—and then

---

[2] Cedar Park calls the doctrine "church autonomy." The two terms are interchangeable. *See Huntsman v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, 76 F.4th 962, 967 (9th Cir. 2023), *petition for reh'g or reh'g en banc filed*. This brief follows the Ninth Circuit's convention of using "ecclesiastical abstention." *See, e.g.*, *id.*

relitigated in the courts by the losing faction. *Id.* at 726. The question before the Court was whether it could decide the dispute or whether it had to defer to the General Assembly's decision. The Court—citing the "broad and sound view of the relations of church and state under our system of laws"—determined that it had to defer to the General Assembly's decision. *Id.* at 727. "In this class of cases," the Court explained, "whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." *Id.* at 728.[3]

Later recognized as having constitutional dimensions, *see Kedroff*, 344 U.S. at 116, the ecclesiastical-abstention principle articulated in *Watson* has continued to demand deference to religious authorities on "matters of ecclesiastical cognizance and polity," *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 698 (1976). That includes, for example, a church's decision about which congregational faction controls church property, *Watson*, 80 U.S. (Wall) at 726, a church's determination of its internal hierarchy, *Kedroff*, 344 U.S. at 119, a church's interpretation of its

---

[3] *Watson* was decided before the First Amendment was incorporated against the states and therefore was grounded in common-law, rather than constitutional, principles. *See Kedroff*, 344 U.S. at 115.

own doctrine, *Milivojevich*, 426 U.S. at 724-25, and a church's choice of who teaches and preaches its faith, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188-89 (2012).

"It is obvious, however," that not every state action touching on a church "jeopardizes values protected by the First Amendment." *Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1968). As long as they do not interfere with churches' ability to make internal governance decisions and determine doctrinal matters, "neutral provisions of state law governing the manner in which churches own property, hire employees, or purchase goods" do not "'inhibit' the free exercise of religion." *Jones v. Wolf*, 443 U.S. 595, 606 (1979). Thus, ecclesiastical abstention is irrelevant where there is no danger of a court answering doctrinal questions or evaluating the reasonableness of religious beliefs. *See, e.g.*, *Huntsman*, 76 F.4th at 968-69; *Puri v. Khalsa*, 844 F.3d 1152, 1167-68 (9th Cir. 2017).

**B.** Cedar Park contends that by requiring insurance plans to provide coverage of reproductive-healthcare services, SB 6219 "effectively forces the church" to alter its religious teachings about abortion and violates the organization's right under the ecclesiastical-abstention doctrine to "propagate *its* beliefs, not a 'different doctrine' preferred by the state." Cedar Park Br. 62 (quoting *Kedroff*, 344 U.S. at 108); *see also* States' Br. 12.

But SB 6219 does no such thing. First, SB 6219 does not force Cedar Park to do anything, because the law regulates insurance carriers, not employers, and is subject to the state's conscience objection statute. *See* Kreidler Br. 7. Second, even if SB 6219 did require the plan purchased by Cedar Park to cover abortion, Cedar Park would remain free as a religious matter to hold, teach, and advocate any views it wants on abortion. Just as a church's belief about corporal punishment wouldn't be altered by battery laws, and a religious employer's belief that women shouldn't work would remain unaffected by equal-pay requirements, so too here does the right to decide "questions of discipline, or of faith, or ecclesiastical rule, custom, or law" continue to lie exclusively with the church. *Kedroff*, 344 U.S. at 113. "The ecclesiastical abstention doctrine has no application to this case." *Burri Law PA*, 35 F.4th at 1212.

**C.** If there were any doubt that Cedar Park misunderstands the ecclesiastical-abstention doctrine, history settles it. As the Supreme Court recently emphasized, the Religion Clauses "must be interpreted by reference to historical practices and understandings," and the "line between the permissible and the impermissible has to accord with history and faithfully reflect the understanding of the Founding Fathers." *Kennedy v. Bremerton Sch. Dist.*, 142 S.Ct. 2407, 2428 (2022) (cleaned up).

That the state may place legal obligations on religious organizations would have been an unremarkable proposition to early Americans, who "regarded [religious] freedom as the right to do only what was not lawfully prohibited." *City of Boerne v. Flores*, 521 U.S. 507, 540 (1997) (Scalia, J., concurring in part) (internal quotation marks omitted). This perspective was informed by the "centuries immediately before and contemporaneous with the colonization of America[, which] had been filled with turmoil, civil strife, and persecutions, generated in large part by established sects determined to maintain their absolute political and religious supremacy." *Everson v. Bd. of Educ.*, 330 U.S. 1, 8-9 (1947); *see also Engel v. Vitale*, 370 U.S. 421, 432-33 (1962); *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 127 n.10 (1982). During the seventeenth and eighteenth centuries, Catholics and Puritans in England were subjected to laws enacted to "destroy dissenting religious sects and force all the people of England to become regular attendants at [the] established church." *Communist Party of U.S. v. Subversive Activities Control Bd.*, 367 U.S. 1, 149-51 (1961) (Black, J., dissenting). Emigration to colonial America was spurred by these religious conflicts and persecutions. *See* Carl H. Esbeck, *Protestant Dissent and the Virginia Disestablishment, 1776-1786*, 7 Geo. J.L. & Pub. Pol'y 51, 57 (2009).

Given the experience of religious supremacy in Europe, "the 'free exercise of religion' mentioned in the first amendment was not originally

understood to include a right to violate legitimate laws with impunity." Ellis West, *The Case Against a Right to Religion-Based Exemptions*, Notre Dame 4 J.L. Ethics & Pub. Pol'y 591, 623 (1990). Although "free argument and debate" were considered by the Founders to be crucial pillars of liberty, "when principles break out into overt acts against peace and good order," it was considered "the rightful purposes of civil government, for its officers to interfere." Thomas Jefferson, An Act for Establishing Religious Freedom (Oct. 31, 1785), *in* The Founders' Constitution (Philip B. Kurland & Ralph Lerner, eds.), http://tinyurl.com/27r6htw5.

Most founding-era state constitutional analogues to the Free Exercise Clause contained caveats reflecting this basic understanding of the Framers that the right to free exercise was not a license to violate any law merely because of a religious objection. *See* Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1461-62 (1990). For example, the free-exercise guarantee of Delaware's Declaration of Rights of 1776 included the qualifier "unless, under colour of religion, any man disturb the peace, the happiness or safety of society." Del. Decl. of Rights of 1776, § 3. The free-exercise guarantee of the Maryland Constitution of 1776 contained the limitation "unless, under colour of religion, any man shall disturb the good order, peace or safety of the State, or shall infringe the laws of morality, or injure others, in their

natural, civil, or religious rights." Md. Const., art. XXXIII (1776). The free-exercise clause of New York's 1777 Constitution provided that "the liberty of conscience, hereby granted, shall not be so construed as to . . . justify practices inconsistent with the peace or safety of this State." N.Y. Const., art. XXXVIII (1777). The Georgia Constitution of 1777 recognized that "[a]ll persons whatever shall have the free exercise of their religion; provided it be not repugnant to the peace and safety of the State." Ga. Const., art. LVI (1777). And the New Hampshire Constitution of 1784 stated that although everyone "has a natural and unalienable right to worship God according to the dictates of his own conscience," none have the right to "disturb the public peace, or disturb others, in their religious worship." N.H. Const., part I, art. 5 (1784); *accord* Mass. Const., art. II (1780); R.I. Charter (1663); S.C. Const., art. VIII, § 1 (1790).

Overall, during the founding era, "[t]he assumption that religious liberty would not, or at least should not, affect civil authority over civil matters was so widely held that a general right of religious exemption rarely became the basis for serious controversy." Philip A. Hamburger, *A Constitutional Right of Religious Exemption: An Historical Perspective*, 60 Geo. Wash. L. Rev. 915, 939 (1992). When conflicts did arise, claims to an unbounded right of religious exemption were flatly rejected. As Professor Vincent Phillip Muñoz has determined, "no antebellum state court interpreted constitutional

protections of religious free exercise to grant exemptions." Vincent Phillip Muñoz, *The Original Meaning of the Free Exercise Clause: The Evidence from the First Congress*, 31 Harv. J.L. & Pub. Pol'y 1083, 1099 (2008) (citing Gerard V. Bradley, *Beguiled: Free Exercise Exemptions and the Siren Song of Liberalism*, 20 Hofstra L. Rev. 245, 276-95 (1991)).

For instance, the Supreme Court of Pennsylvania held in 1831 that while "religious scruples of persons concerned with the administration of justice[ ] will receive all the indulgence that is compatible with the business of government," respect for religious obligations "must not be suffered to interfere with the operations of that organ of the government which has more immediately to do with the protection of person[s]." *Phillips v. Gratz*, 2 Pen. & W. 412, 416-17 (Pa. 1831). Similarly, in 1854, the Supreme Judicial Court of Maine noted that it "is not disputed" that "society['s] . . . right to interfere on the principle of self-preservation" prevails over the right to free exercise of religion. *Donahoe v. Richards*, 38 Me. 379, 412 (Me. 1854).

"Church autonomy—in the sense of an independent power to act outside the law—was not part of the Framers' intent [or] the framing generation's understanding." Marci A. Hamilton, *Religious Institutions, the No-Harm Doctrine, and the Public Good*, 2004 BYU L. Rev. 1099, 1156-57. But that independent power is what Cedar Park seeks here. This Court should refuse Cedar Park's invitation.

**II.   Granting Cedar Park's request would render Free Exercise jurisprudence and the ministerial exception superfluous.**

Cedar Park's argument would not only expand the ecclesiastical-abstention doctrine, it would also effectively abrogate broad swaths of First Amendment law—namely, *Employment Division v. Smith*, 494 U.S. 872 (1990), and the ministerial exception, *see Morrissey-Berru*, 140 S.Ct. at 2060-61—something this Court cannot do.

**A.** Under *Smith*, laws that are religiously neutral and generally applicable are subject only to rational-basis review, meaning that they are valid as long as they are rationally related to a legitimate government interest, even when they incidentally burden the exercise of religion. *See Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1076, 1084 (9th Cir. 2015). To invoke more exacting judicial scrutiny, a religious litigant must show that the challenged law is not neutral and generally applicable because it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interest in a similar way" or "restricts practices because of their religious nature." *Fulton v. City of Phila.*, 141 S.Ct. 1868, 1877 (2021).

Under Cedar Park's reading of the ecclesiastical-abstention doctrine, religious entities would never need to show that a law isn't neutral or generally applicable. That is because, according to Cedar Park, religious

disagreement with a law is sufficient to raise ecclesiastical-abstention issues regardless of whether the law is neutral or generally applicable. The upshot is that a religious entity could effectively opt out of any law that it dislikes merely by stating a religious objection to the law's requirements.

The Supreme Court has squarely rejected that approach. As the Court explained just seven years after *Watson*, to allow religious actors to opt out in every instance of conflict between the law and religious belief "would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself. Government could exist only in name under such circumstances." *Reynolds v. United States*, 98 U.S. 145, 167 (1878). Accordingly, the Court has rejected bids for religious exemptions in cases challenging civil-rights laws, *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402 n.5 (1968) (per curiam), tax policies, *Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983), Social Security requirements, *United States v. Lee*, 455 U.S. 252, 254 (1982), and wage-and-hour regulations, *Tony & Susan Alamo Found. v. Sec'y of Lab.*, 471 U.S. 290, 303 (1985). In each of those cases, a religious organization disagreed with a law on religious grounds. But that was not enough to raise ecclesiastical-abstention issues, so the cases were resolved under the Free Exercise Clause. Cedar Park fails to explain why this case does not demand the same outcome.

**B.** Cedar Park's ecclesiastical-abstention argument would also make the ministerial exception a dead letter. The First Amendment's Religion Clauses shield religious employers from liability for discrimination against ministerial employees—*i.e.*, those who play an important role in preaching or teaching the faith. *Morrissey-Berru*, 140 S.Ct. at 2060-61. That is because applying antidiscrimination laws to ministers—employees who are "essential to the performance" of religious functions, *Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., concurring)—would gravely intrude on a religious group's freedom to "shape its own faith and mission," *id.* at 188 (majority op.).

The ministerial exception does not apply here because SB 6219 does not affect Cedar Park's authority to choose who teaches and preaches its faith. But Cedar Park relies heavily on language taken out of context from ministerial-exception cases to support its argument that religious entities have a right to defy laws that an entity can loosely frame as affecting "internal church decisions." Cedar Park Br. 62; *see also* Sutherland Inst. Br. 11.

Cedar Park is wrong. Ecclesiastical abstention does not protect *every* "internal decision." Rather, it covers only those decisions that concern "religious authority or dogma." *Hosanna-Tabor*, 565 U.S. at 190. The existence of the ministerial exception proves why. If the ecclesiastical-

abstention doctrine "was so expansive as to create in all religious employers a First Amendment right to" opt out of any law touching on an internal church decision, "then there would be no need to have a ministerial exception." *Billard v. Charlotte Cath. High Sch.*, No. 17-cv-11, 2021 WL 4037431, at *12 (W.D.N.C. Sept. 3, 2021), *appeal argued*, No. 22-1440 (4th Cir. Sept. 20, 2023). A religious employer seeking an exemption from an employment law could cite interference with internal decision-making and be free of the law's requirements, regardless of whether the employees affected by the law carry out ministerial duties.

To put a finer point on why Cedar Park's argument makes little sense, consider the practical reality that employers face when litigating the ministerial exception. The exception is a fact-intensive defense, often requiring discovery and dedicated briefing about who qualifies as a ministerial employee. And it is raised, necessarily, where a given law affects a religious employer's internal decisions pertaining to its employees. In *Hosanna-Tabor*, for example, the Court recognized that the Americans with Disabilities Act regulates religious employers' internal employment decisions—even decisions that an employer makes for religious reasons. 565 U.S. at 179-80. But that did not end the analysis—instead, the Court proceeded to determine whether the "employee qualifie[d] as a minister." *Id.* at 190. If the ecclesiastical-abstention doctrine acted as an absolute

shield against employment-discrimination liability for all internal employment actions, why would the Court have gone through the effort of determining whether the employee was a minister? Cedar Park does not and cannot answer that question.

## CONCLUSION

The ecclesiastical-abstention doctrine is meant to protect religious institutions' ability to make ecclesiastical determinations about religious doctrine and church governance without government interference. It is not a free pass for anything that can be tangentially tied to religious beliefs. It is not an end-run around long-standing First Amendment doctrine. And it is not a vehicle to violate laws religious organizations don't like. The judgment of the district court should be affirmed.

Respectfully submitted,

*/s/ Bradley Girard*

BRADLEY GIRARD
JENNY SAMUELS
Americans United for Separation of
  Church and State
1310 L Street NW, Suite 200
Washington, D.C. 20005
(202) 466-3234

*Counsel for* Amici Curiae

January 29, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 23-35560

I am the attorney or self-represented party.

**This brief contains** 3,675 **words,** including [ ] words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    ☐ it is a joint brief submitted by separately represented parties.

    ☐ a party or parties are filing a single brief in response to multiple briefs.

    ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [ ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Bradley Girard **Date** 1/29/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

**CERTIFICATE OF SERVICE**

I certify that on January 29, 2024, this brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system.


_/s/ Bradley Girard_